NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 16a0121n.06

Nos. 13-5122, 13-6391, 13-6422

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 02, 2016
DEBORAH S. HUNT, Clerk

UNITED STATES of AMERICA,

    *Plaintiff-Appellant*,

    v.

IDRIS FAHRA, *et al.*,

    *Defendants-Appellees*.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

Before: BATCHELDER and WHITE, Circuit Judges; and COX, District Judge.[*]

**ALICE M. BATCHELDER, Circuit Judge.** In this, one of two companion opinions from this panel in separate appeals from a much larger criminal prosecution, the government challenges the district court's grants of acquittal to three defendants whom the jury had convicted. The government contends that the district court erred by finding a material variance between the charges in the indictment and the proof at trial—specifically, that the prosecution had charged a single conspiracy but presented evidence at trial that proved, at best, multiple conspiracies. Thus, in this appeal, the question is whether a reasonable juror could find a single, overall conspiracy when the evidence produced at trial is viewed in the government's favor.

For the reasons that follow, we AFFIRM the district court's grants of acquittal to defendants Idris Fahra, Andrew Kayachith, and Yassin Yusef.

**I. Background**

The federal prosecutor in Nashville, Tennessee, obtained a grand jury indictment in the

_____

[*] The Honorable Sean F. Cox, United States District Judge for the Eastern District of Michigan, sitting by designation.

United States District Court for the Middle District of Tennessee, charging each of 30 defendants with one or more of 20 different federal offenses, relating to the alleged operation of a large-scale sex trafficking ring, spanning nine cities in four states over ten years, from January 2000 until July 2010. All but one of these 30 defendants were Somali immigrants or refugees (Andrew Kayachith, a.k.a. "AK," is Asian-American) and all but one were male (Fadmo Mohmed Farah, a.k.a. "Barney," is a Somali female). While all but a few of these defendants were members of Somali gangs,[1] as of 2010, many of these defendants were boys aged 17 to 21 years old, attending school and living with their parents. Also, most of these defendants lived in or around Minneapolis, Minnesota, and that is where this case started.

Heather Weyker was a St. Paul, Minnesota, police officer and member of an FBI Task Force on sex trafficking. In November 2008, Officer Weyker went to the Minneapolis-area home of a Somali refugee-immigrant family and sought to speak with the ninth-grade daughter, referred to throughout this case as "Jane Doe 2." Although a Somali immigrant, Jane Doe 2 was an Americanized teenager, by all accounts beautiful and buxom (which had garnered her the nickname "Double D" two years earlier, when she was in the seventh grade), living in an ultra-conservative, African, Muslim household. Jane Doe 2 was also a habitual runaway who had a history with the police and had been incarcerated briefly in juvenile detention several months earlier. And it has since been established, as many in the Somali community knew at the time, that Jane Doe 2 was older than her then-asserted age of 15 (the age based on her mother's false claim that she was born in September 1994). While Jane Doe 2's actual age remains in dispute,

---

[1] This case involves two Somali gangs: Somali Mafia and Somali Outlaws. But these are actually two parts of the same gang, differentiated by age, the Somali Mafia comprising adults and the Somali Outlaws minors (i.e., younger than age 18). Of the three appellees here, Kayachith was not a gang member at all (he was not even Somali), Yusef was a Somali Outlaw, and it appears that Fahra was likely a Somali Outlaw. Other than the distinction based on age and exhaustive accusations of gang membership, based almost exclusively on witness testimony that gang members "claimed it" or flashed gang signs, the prosecution produced no information about either of these gangs, i.e., gang initiation and culture, organization or structure, criminal activity, etc.

the FBI has declared her proffered birth certificate a forgery and substantial evidence has shown that she is at least five months older and likely as much as four years older than her claimed age. Also, DNA evidence and later testimony revealed that their claimed family structure was a lie, concocted to facilitate their immigration. Whereas they had presented themselves as a mother with three biological children (an older daughter, a middle son, and Jane Doe 2, the youngest) living with an unrelated step-father, the adults were actually the biological parents of the two girls, while the boy was unrelated and actually much younger than the age they attributed to him.

When Officer Weyker sought to speak with Jane Doe 2 in November 2008, the parents objected, so Weyker met Jane Doe 2 surreptitiously at her school. Over the next several months, their secret meetings led to over 30 recorded interviews and thousands of pages of notes, transcripts, and other documents. These meetings also produced a story in which Jane Doe 2 was not a troubled runaway or juvenile delinquent, but was instead an innocent child taken in by a Somali gang who used her for sex, either as a prostitute or for free sex with the gang members. At this point, certain aspects of this story and investigation warrant attention. First, despite countless opportunities, Jane Doe 2 had never told this story before—not to her parents, her sister, or any friends; not to any police officer during the many times she was apprehended as a runaway; not upon her incarceration at juvenile detention or during her counseling there. The district court opined that Officer Weyker likely exaggerated or fabricated important aspects of this story, noting (among other inconsistencies) that Weyker's final reports frequently referred to sex for money while that assertion was conspicuously absent from her handwritten notes, appearing only once in all of those rough notes. And Jane Doe 2 herself furthered the district court's suspicion when she testified on cross examination that Weyker had misstated facts in the reports, adding to and omitting things from her statements. Elsewhere, the district court caught Weyker lying to the grand jury and, later, lying during a detention hearing, and scolded her for it

on the record. The defense has since pointed out that Weyker also lied on an application to get Jane Doe 2's family some $3,000 from the Tennessee victim's compensation fund, by claiming "abduction" (Jane Doe 2 flatly denied an abduction) and endorsing the validity of the forged birth certificate. Finally, it is curious that even though Officer Weyker (the lead agent), Jane Doe 2 (the principal victim-witness), and all but a few of the 30 defendants reside in Minnesota, and an overwhelming portion of the events at issue occurred in Minnesota, the federal prosecutor in Minnesota did not prosecute this case in Minnesota.

Instead, the federal prosecutor in Nashville, Tennessee, prosecuted this case in the Middle District of Tennessee because, in April 2009, Jane Doe 2 accompanied five boys (all charged in the indictment and two tried as defendants here) on a car trip to Nashville, without informing her parents, who eventually reported her missing. When the Minneapolis/St. Paul police tracked her cell phone to Nashville, Officer Weyker involved the FBI and turned this latest "runaway" into a presumed kidnapping. The FBI relayed the cellphone location to the Nashville Police who located the group and arrested Jane Doe 2 as a juvenile delinquent and a runaway, and questioned her separately from the boys. Initially, she told the police that one of the Somali boys, Hollywood (with them on the trip and charged in the indictment, but not tried in this case), was her boyfriend; that she had come with them on the trip willingly; and that she had sex with several people over the preceding few days because she was upset with Hollywood for ignoring her. She also wrote out and signed a statement saying the same. She did not mention any prostitution or sex trafficking. But when the Nashville Police put her on the telephone with Officer Weyker, she changed her story to include acts of prostitution and sex trafficking.

The Nashville Police had also arrested the five boys, for contributing to the delinquency of a minor. Because none could afford bail, they waited in jail and made several telephone calls, recordings of which were introduced at trial as evidence to connect many of the 30 defendants

4

criminally. More importantly, when Officer Weyker and the FBI task force got involved, and Jane Doe 2 started talking about sex and prostitution, the Nashville federal prosecutor was able to put her story together with certain other witnesses, most notably Jane Doe 5, a Nashville resident, and then charged these five boys (and 25 others) with felony sex trafficking.

## II. Trial and Jury Verdict

The indictment charged 30 defendants under a single sex trafficking conspiracy, spanning four states over ten years. In discovery, the prosecution named hundreds of witnesses and disclosed over 35,000 pages of documents and 175 hours of recorded conversations (and added another 6,000 pages and 14 hours of phone calls after trial had begun). Following numerous pre-trial motions and rulings, including severance of several defendants and multiple continuances, the parties selected a jury in March 2012 for trial of the first nine defendants on four charges:

Count 1: Conspiracy to commit sex trafficking of victims under the age of 18 (or under the age of 14), in violation of 18 U.S.C. § 1591(a)(1).

Count 2: Conspiracy to benefit financially from a venture to sex traffic victims under the age of 18 (or 14), in violation of 18 U.S.C. § 1591(a)(2).

Count 12: Sex trafficking of Jane Doe 2, a minor under the age of 14, in violation of 18 U.S.C. § 1591(a).

Count 13: Attempting to sex traffic Jane Doe 2, a minor under the age of 14, in violation of 18 U.S.C. § 1594(a).

The nine defendants tried in this first trial were:

#3  Ahmad Abnulnasir Ahmad, "Fabulous"
#6  Musse Ahmed Ali, "Fat Boy"
#8  Fadmo Mohmed Farah, "Barney" (female)
#9  Idris Ibrahim Fahra, "Chi Town"
#12  Fatah Haji Hashi, "Jerry"
#15  Dahir Nor Ibrahim, "Dahir Lucky"
#17  Andrew Kayachith, "AK" (Asian-American, not Somali)
#29  Yassin Abdirahman Yusuf, "Junior"
#30  Mohamed Ahmed Amalle, "DK"

Each defendant had individual counsel defending against the individualized charges within the overall sex trafficking conspiracy charge. Thus the defense was as complex as the prosecution,

and the court anticipated a lengthy and costly trial. For just this first trial, the prosecution had named over 200 intended witnesses and proposed that trial would last over three months.

Instead, the trial lasted just three weeks. The prosecution's case in chief lasted 10 days and included 49 witnesses, though only six offered substantive, material testimony. The prosecution's principal witnesses were Jane Doe 2 and Jane Doe 5, two alleged victims of the purported sex trafficking operation. The other four significant material witnesses had known Jane Doe 2 and were present for some part of her story, though two of them actually denied that any sex trafficking had occurred and the other two could only speculate.

Before continuing, we acknowledge that we are proceeding, as we must, on the story the prosecution presented at trial, despite our acute concern, based on our painstaking review of the record, that this story of sex trafficking and prostitution may be fictitious and the prosecution's two primary witnesses, Jane Doe 2 and Jane Doe 5, unworthy of belief. We are, of course, limited to only the witness testimony and evidence introduced at trial—and that on a paper transcript—but we also note the district court's expression of similar concerns. These witnesses repeatedly contradicted, disavowed, and refuted their own testimony, while other portions of their testimony defied belief or were rendered implausible by indisputable contradictory evidence. Given that all nine defendants were acquitted of all charges (six by the jury and three by the court), we merely recognize that we start our analysis from what is likely a fictitious story.

Jane Doe 2 testified for five days and provided most of the prosecution's evidence. She claimed that certain Somali boys began "sex trafficking" her in November 2006, when she was in the seventh grade.[2] At their first meeting, four boys drove her to a public park in a green minivan, where she gave them oral sex because they told her she was attractive and they were in

---

[2] Jane Doe 2 testified at length about a number of different people, mostly Somali boys and men. Some were defendants in this trial, others were named in the indictment but were not defendants in this trial, and still others were not named in the indictment. There was also significant confusion regarding names and nicknames.

a gang. There was no force, threat, or offer of money payment. Afterward, they drove her to defendant Fahra's apartment, where she had vaginal sex with a Somali boy. Again, there was no force, threat, or offer of money. But the boys told her that, from then on, gang members would have sex with her without charge and would make money by charging others for sex with her. They drove her to another apartment where she had sex with two men while certain Somali boys collected money. She said that this happened again on several occasions, typically Fridays about once per month, until May 2007. A Somali boy would call her, tell her they had a "mission" for her (i.e., prostitution), and take her to an apartment where men would have sex with her for money. Sometimes she would spend the night and the next day with the Somali boys.

Next, she testified about a specific event in May 2007, when the police had arrested her as a runaway after finding her in a car with five Somali boys during a routine traffic stop in Rochester, Minnesota (about a 90 minute drive from her home). At the time, she told the police that they had gone to Rochester to rob a Somali liquor store and that she had even held the gun they had with them. But at trial she testified that after she did "missions" on Friday night at Fahra's apartment and slept there that night, on Saturday night they drove her to Rochester to prostitute her. She also claimed that, on the way, they stopped at a gas station and tried to sell her as a permanent "sex slave," but did not complete the sale. The traffic stop and arrest prevented any sex trafficking, and ultimately led her parents to place her in juvenile detention. After that night, she did not have any contact with those boys for almost two years, until 2009.

Finally, she testified about a specific event in April 2009, which began on a Friday evening in Minneapolis and ended on a Tuesday morning in Nashville. By then, she was in the ninth grade and dating Hollywood (named in the indictment, but not a defendant in this trial), who was 18 or 19 years old and a Somali Outlaw gang member. On Friday, April 24, 2009, Hollywood and two other boys picked her up after school, along with her friend Saida Haji, and

7

they went to an apartment where she had sex with Hollywood, who then told her to have sex with the other boys and left. She had sex with the others, including defendant Kayachith (the Asian-American boy), willingly and under no threat or compulsion. Saida Haji did not have sex with anyone. When Hollywood returned, they all left in Kayachith's car and, after they dropped off Saida, Jane Doe 2 stayed with them to attend an African Night Party at the University of Minnesota. From the party they went to a hotel room where she again had sex with Hollywood. The other boys also slept in that same hotel room, but without any further sex.

She testified that the following morning (Saturday), the boys were planning a trip to Nashville and decided to prostitute her to raise money for the trip. She, Hollywood, and two others (including Kayachith) picked up defendant Yusuf and they drove to alleys around the city where she had sex with at least 10 different men for money, each time in the car. Later, she went with Yusuf and two others to get alcohol and marijuana. She had sex with all three of them and spent the night at a house where she slept with Yusuf and had sex with him again. The next morning (Sunday, April 26), she and five boys (including defendants Kayachith and Yusuf) again drove to alleys for her to have sex for money, until she protested and they stopped.

Late that evening, Jane Doe 2 and five boys, including Hollywood, Kayachith, and Yusuf, left for Nashville. They drove all night and arrived in Nashville late Monday. They all shared one hotel room, but she declined to have sex with any of them, explaining that she was not feeling well. Meanwhile, her parents had reported her missing, the Minneapolis police had tracked her cell phone to Nashville, and Officer Weyker had involved the FBI. On Tuesday morning (April 28, 2009), the Nashville police arrested them outside a Somali restaurant. When questioned, she told the Nashville Police that she had sex with several people during the preceding few days because she was upset with her boyfriend, Hollywood, for ignoring her. She also said they had come to Nashville to steal car parts to repair a car. She made no mention of

8

any alleys, money, or prostitution. She also wrote out and signed a two-page written statement to the same effect. At trial, she authenticated both the recorded conversation with the Nashville Police and the written statement. She also authenticated a recorded telephone conversation she had that evening with Officer Weyker, during which she changed her version of events to claim that her sex acts over the past few days had been prostitution and sex trafficking.

In short, Jane Doe 2 testified that the purpose of the Nashville trip was sex trafficking, so that the boys could prostitute her in Nashville. But she also testified that no one forced her to have sex, threatened her, coerced her, or paid her, and, further, that she had declined sex several times and there were never any adverse consequences or ramifications for her doing so.

The prosecution's other material witness was Jane Doe 5. According to all of the evidence, Jane Doe 5 is not connected to Jane Doe 2 in any way: they never met, they were never at the same location, and their stories do not intersect. Jane Doe 2 could not identify Jane Doe 5 nor did she accuse any of the defendants that Jane Doe 5 accused; the only defendant Jane Doe 5 identified whom Jane Doe 2 also identified was Liban Omar, a.k.a. "Sunderra" (named in the indictment but not a defendant in this case), whom Jane Doe 2 seen only once, briefly, when he had been sleeping on a motel bed. Jane Doe 5 identified a picture of Jane Doe 2 (as "Double D") and testified that she recognized Hollywood and Yusuf (though she did not know their names) from a picture she had seen of them in a car with Double D. The prosecution did not pursue this.

Jane Doe 5 identified eight defendants by name and accused six of sex trafficking crimes, including three brothers who were friends with Hollywood: Abdifatah, Liban, and Mohamed Omar. Jane Doe 5 did not identify Fahra, Kayachith, or Yusuf, the appellants before us here, or corroborate any of Jane Doe 2's testimony about them or any of those events.

Jane Doe 5's own testimony is the sole evidence of her part in the alleged sex trafficking conspiracy. But Jane Doe 5 has been diagnosed as insane and was off of her medication at trial.

9

She did not know what day or month it was, she misidentified or could not identify many defendants, she contradicted herself repeatedly (on major issues, such as whether or not she had sex for money), and she argued with counsel over the smallest of details. But taking her testimony in the light most favorable to the prosecution, as we must, the gist of her story is that, sometime between 2003 and 2006, while she was living in an apartment with Barney (the female Somali defendant), some men came there and she had sex with them because she liked them, but unbeknownst to her, Barney collected money for that. Also, when she lived in Minnesota, circa 2000, Barney's husband Faleebo once provided her a place to sleep in exchange for sex; and Faleebo and another defendant, Dahir Lucky, offered to move her from Minnesota to Nashville and give her a better life if she would have sex with men, but she declined. Finally, the Omar brothers, at different times, wanted her to have sex with men so that they could collect money for it, but she declined. She also testified that they probably had other girls for sale.

The prosecution also introduced recorded telephone calls that certain defendants made while jailed in Nashville.[3] These calls are the only evidence connecting the "Jane Doe 2" defendants and the "Jane Doe 5" defendants; these calls, therefore, are the only evidence to prove the prosecution's theory of a single, all-encompassing conspiracy. Simply put, Jane Doe 2 testified about sex trafficking by certain defendants, including Hollywood; Jane Doe 5 testified about sex trafficking by certain other defendants, including Sunderra (Liban Omar). The prosecution presented these telephone calls between Hollywood and Sunderra to connect these two defendants and, accordingly, connect the two groups into a single conspiracy.

In the first call, between Hollywood in jail and Sunderra and British (Abdifatah Omar) on the outside, Sunderra explained that the charge was contributing to the delinquency of a minor, namely, Jane Doe 2, and relayed to Hollywood that Jane Doe 2 had told the police that

Hollywood was her boyfriend, that all of the others had sex with her, and that her parents wanted to press criminal charges. Hollywood expressed dismay or disbelief, and urged them to "go talk to the family . . . just tell them that we are just giving her a ride, man." They agreed that British knew Jane Doe 2's older sister and could talk to the family, but insisted to Hollywood that he should get a lawyer. Hollywood repeated the need to deter the family from pressing charges.

In a second call between Hollywood (in jail) and Sunderra (out), Sunderra advised Hollywood to have his father talk with Jane Doe 2's family, but Hollywood was no longer concerned about her family. They established that no one had talked with Jane Doe 2's family, but felt she was not believable so they would stick to a story that Hollywood did not bring her to Tennessee and wasn't with those who brought her, instead claiming he took a Greyhound bus.

In a third call between Hollywood (in jail) and Sunderra (out), they discussed the police seizures of bedding from certain defendants, rumors that Jane Doe 2 was pregnant, and further rumors that she was in Minneapolis boasting that she was responsible for locking them all up. This last rumor was confirmed in the next call, in which Sunderra and Hollywood discussed that Jane Doe 2 was in Minneapolis and had called two other defendants' parents to curse them and boast: "I locked up your son." They did not discuss any obstruction or witness tampering.

The prosecution's theory was that all of the defendants were engaged in one interrelated conspiracy to sex traffic Jane Doe 2 and Jane Doe 5. The proof of this single conspiracy, the prosecution contended, was the evidence that Hollywood had coordinated with Sunderra and British (both accused by Jane Doe 5 of some degree of sex trafficking) to contact Jane Doe 2's family to urge them to drop the charges against him.

At the close of the prosecution's case, the nine defense attorneys moved for acquittal of their respective defendants, but the court deferred decision on those motions. Each then

---

[3] Because the calls were spoken in Somalian, an interpreter read transcribed versions into the record.

presented a defense (introduced evidence, questioned witnesses, and made arguments), but none of the defendants testified. Eventually, the attorneys made their closing arguments and the court instructed the jury. Because Congress had changed part of § 1591's scienter requirement in December 2008 (from "knowingly" to "reckless disregard"), the court instructed on ten (10) separate charges, including the aiding and abetting possibilities for each count:

Count 1  Conspiracy to sex traffic children, before Dec. 2008 (knowingly);
conspiracy to sex traffic children, after Dec. 2008 (reckless disregard);
aiding and abetting conspiracy to sex traffic children.

Count 2  Conspiracy to benefit financially from a venture to sex traffic children, before Dec. 2008 (knowingly);
conspiracy to benefit financially from a venture to sex traffic children, after Dec. 2008 (reckless disregard);
aiding and abetting conspiracy to benefit financially from a venture to sex traffic children.

Count 12  Sex trafficking of Jane Doe 2, a minor child;
aiding and abetting sex trafficking of Jane Doe 2, a minor child.

Count 13  Attempting to sex traffic Jane Doe 2, a minor child;
aiding and abetting attempting to sex traffic Jane Doe 2, a child.

The jury deliberated for five days and reached a verdict on Friday, May 4, 2012, acquitting six defendants of all charges and convicting three of some of the charges. The jury convicted Idris Fahra of aiding and abetting a conspiracy to sex traffic children and aiding and abetting the actual sex trafficking of Jane Doe 2, a minor child. The evidence against Fahra was Jane Doe 2's testimony that other defendants brought her to his apartment between November 2006 and May 2007 to prostitute her there. The jury acquitted three defendants whom Jane Doe 2 had accused of participating in those same activities. Three others were not tried in this case. Defense evidence revealed that Fahra, a college student, had moved to Nebraska in June 2007. Neither Jane Doe 2 nor any other witness or evidence implicated Fahra in the May 2007 Rochester trip, the April 2009 Nashville trip, or any other events described in this case.

The jury convicted Andrew Kayachith (the Asian-American) of conspiracy to sex traffic children after December 2008, specifically Jane Doe 2 during the April 2009 weekend of the Nashville trip. The evidence against Kayachith was Jane Doe 2's testimony and photos of her backpack and school clothes the police discovered in his car. According to Jane Doe 2's testimony, she first encountered Kayachith on Friday, April 24, 2009, at a house with some of the Somali boys. She performed oral sex on him, at Hollywood's instruction, but did not have any type of sex with him again after that. He drove them in his car, first from the house to a store where she purchased clothes for the Africa Night Party, then to the party, and afterward to the motel. He was part of the group that took her to alleys the next day, to prostitute her to raise money for the trip to Nashville, and he was on the trip to Nashville, but they did not take his car. The jury acquitted two other defendants whom Jane Doe 2 had accused of participating in those same activities. Others were not tried in this case. Neither Jane Doe 2 nor any other witness or evidence implicated Kayachith in the activities at the apartments between November 2006 and May 2007, the May 2007 Rochester trip, or any other events alleged in this case.

The jury convicted Yassin Yusuf of conspiracy to sex traffic children after December 2008, specifically Jane Doe 2 during the April 2009 weekend of the Nashville trip. The evidence against Yusuf was Jane Doe 2's testimony. She testified that Yusuf was not present on Friday, April 24, 2009 (i.e., at the house, the African Night Party, or the motel afterwards), but on Saturday morning, she, Hollywood, and three others picked up Yusuf and they drove to alleys where she had sex with men, in the car, for money. Later, she went with Yusuf and two others to get alcohol and marijuana and she had sex with them. After that, she and Yusuf spent the night together and, the next morning, he was again part of the group that took her to alleys to prostitute her to raise money for the trip to Nashville. He went on the trip to Nashville. The jury acquitted two other defendants whom Jane Doe 2 had accused of participating in those same activities.

13

Others were not tried in this case. While Yusuf had known Jane Doe 2 during the events in 2006 and 2007, he was himself a minor at that time and not charged with those activities.

The verdict as a whole indicates that the jury apparently rejected all of the charges supported by Jane Doe 5's testimony, any conspiracy to benefit financially from a venture to sex traffic (i.e., Count 2), and the charges based on the May 2007 Rochester trip. The jury appears to have found two specific crimes. First, Fahra aided and abetted sex trafficking of Jane Doe 2 and a conspiracy to do so in 2006 and 2007, but did not actually sex traffic her (Count 12), attempt to sex traffic her (Count 13), or even aid or abet a venture to benefit financially from sex trafficking her (Count 2). And, second, Kayachith and Yusuf conspired to sex traffic Jane Doe 2 in April 2009, but did not actually sex traffic her (Count 12), attempt to sex traffic her (Count 13), or even aid or abet sex trafficking (Count 12), attempted sex trafficking (Count 13), or a venture to benefit financially from sex trafficking her (Count 2). Given the limited scope of these convictions, and the acquittals on all other charges and of the other six defendants, one could reasonably infer that the jury did not find a single, all-encompassing conspiracy, but instead found two distinct conspiracies: a conspiracy to traffic Jane Doe 2 in 2006-2007, involving Fahra and others not tried here, but not the three defendants acquitted here of these same accusations; and a conspiracy to traffic Jane Doe 2 in April 2009, involving Kayachith, Yusuf, and possibly others not tried here, but not the two defendants acquitted here of these accusations.

### III. Post-Trial Acquittal

Following their convictions, Kayachith and Yusuf renewed their Rule 29 motions for acquittal, which they had raised during trial and on which the court had deferred decision. They raised multiple bases, including the claim of an improper variance between the charges in the indictment and the proof at trial. Specifically, they argued that the prosecution had charged a single conspiracy but presented evidence at trial that proved, at best, multiple conspiracies.

14

The district court agreed and held that the material variance required it to set aside the convictions. The court reasoned that the jury, in acquitting all defendants on Count 2, had rejected the existence of a "venture." The court also noted that the prosecution had produced no evidence connecting Fahra, Kayachith, or Yusuf to Jane Doe 5 in any way. The prosecution had relied on the three Omar brothers as the connection between Jane Doe 5 and Jane Doe 2, in that Jane Doe 5 testified about them whereas Hollywood, while incarcerated, asked them to intervene with Jane Doe 2's family on his behalf. But the court found no evidence that any of the Omar brothers actually contacted Jane Doe 2's family and held that this would not serve as a sufficient connection between the two groups. Furthermore, the court concluded that it did not appear the jury believed Jane Doe 5 at all, suggesting that there was no second (Jane-Doe-5-centric) sex trafficking conspiracy. Ultimately, the court found no proof that the defendants were all acting in furtherance of a common goal or that there was any significant interdependence among them, and concluded that there was no evidence of a single conspiracy.

The government appealed this grant of acquittal (Sixth Circuit Case No. 13-5122). Meanwhile, Fahra had moved to join Kayachith's and Yusuf's motion for acquittal. At an ensuing hearing, the district court noted that the government's notice of appeal deprived it of jurisdiction, with certain exceptions. One such exception was Fahra's motion for acquittal, which the court granted on the same bases that it had granted Kayachith's and Yusef's. Finally, the court, without addressing it specifically, also granted Fahra's motion for acquittal on his conviction for aiding and abetting the actual sex trafficking of Jane Doe 2, which was not a conspiracy charge and therefore not subject to the material variance issue. The government appealed (No. 13-6391) and when the district court memorialized that same judgment in a written order, the government filed an appeal of that order as well (No. 13-6422).

**IV. Analysis**

We have jurisdiction pursuant to 18 U.S.C. § 1291. This appeal concerns the district court's grant of Rule 29 acquittals based on its finding a material variance between the single conspiracy alleged in the indictment and the evidence of multiple conspiracies presented at trial. Because the district court granted the acquittals after the jury had rendered guilty verdicts, if the government were to prevail on appeal, the district court would merely reinstate the jury's guilty verdicts and the defendants would not be tried twice. Consequently, double jeopardy does not bar this appeal. *See United States v. Jones*, 580 F.2d 219, 221 n.3 (6th Cir. 1978).

**A.**

Considering the evidence produced at trial in the light most favorable to the prosecution and the guilty verdicts, the district court held that the prosecution had proven only that "different and unconnected groups of persons act[ed] with different females at different times in different cities and states," but had presented no "evidence of an 'enduring arrangement' []or the 'significant interdependence' of the members of the alleged conspiracy." In short, the court held that this was not a single conspiracy as charged in the indictment, but was at best proof of multiple conspiracies. The government disagrees.

When the district court finds a variance at trial from the indictment, we review that decision de novo. *United States v. Hughes*, 505 F.3d 578, 587 (6th Cir. 2007). "A variance occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Id.* Specifically, when the indictment alleges a single conspiracy but the evidence at trial shows multiple conspiracies, the variance between the indictment and the proof, if it is prejudicial, is reversible error. *Id.*

One way that proof of multiple conspiracies can cause prejudice is from the "spillover" effect of a large number of improperly joined co-defendants, in which the jury "mistakenly

16

believes there is a union of interest and criminal intent[,] and an agreement to coordinate activity, [such that] the harm to the public [] appear[s] to be greater and the participants more culpable." *United States v. Swafford*, 512 F.3d 833, 843 (6th Cir. 2008). That is the situation here.

The government argues that the district court misconstrued the evidence and insists that the proof at trial did not vary from the indictment, that the evidence proved a single conspiracy, and that the district court made four mistakes in its finding multiple conspiracies: two legal errors in its interpretation and application of 18 U.S.C. § 1591; a factual error in finding that the jury disbelieved Jane Doe 5's testimony; and a logical deduction error in concluding that the acquittal of all defendants on the Count 2 "venture" charge was proof of multiple conspiracies. While each of these arguments has or could have some merit standing alone, we find that, in this larger analysis, they merely distract from the central question and are ultimately unpersuasive.

We turn first to the two alleged legal errors, which we analyze fully in our companion opinion, *see United States v. Afyare*, No. 13-5924. Even if we accept, *arguendo*, the government's view of § 1591, we cannot find that the prosecution proved a single, unified conspiracy. The government argues that the district court misinterpreted § 1591(a)(1) by applying it only to children whereas it actually applies also to adults if the trafficking is done by force, fraud, or coercion. But the prosecution alleged sex trafficking of *children* in the indictment; there was no allegation of any trafficking of an adult at all, let alone by force, fraud, or coercion, nor did the prosecution present evidence at trial of force, fraud, or coercion. The government's interpretation of the statute would produce no additional convictions. More importantly, it would not connect the otherwise unrelated groups into a single conspiracy.

Similarly, the government argues that the district court misinterpreted § 1591(a)(2) by limiting a "venture" to a "sex trafficking venture" whereas, in its view, "venture" actually means any "association" of people for any purpose. But this misses the point. The court did not grant

acquittal because the prosecution failed to prove *any* association. The prosecution produced evidence that might demonstrate at least two, and perhaps more, separate and unrelated criminal sex trafficking conspiracies, but did not produce evidence to connect those unrelated conspiracies (and conspirators) into a single, unified conspiracy. Consequently, the proof at trial differed materially from the charge in the indictment. Evidence that the defendants were cooperatively engaged in some other, *non*-sex-trafficking venture would not change that result.

As for the government's claim that the district court erred by disbelieving Jane Doe 5, we find it hard to fathom how the jury would have believed her in any way. But the government argues that the jury could have believed Jane Doe 5 but acquitted the defendants on the basis that she was an adult and the court had instructed them to convict only if she were a child. Even if this unlikely scenario is true, however, it merely refutes one basis the court relied on to reject the existence of a single conspiracy; it does nothing to *prove* a single conspiracy. And in any event, the indictment charged only conspiracy to traffic and trafficking of children, not adults.

The district court similarly relied on a logical deduction that the jury had convicted separate defendants of separate and unrelated events, but acquitted all nine defendants of all the Count 2 "venture" charges, because it found no venture, but only multiple, unrelated conspiracies. The government argues that "[i]nconsistent verdicts provide no basis for reversal and court's [sic] are precluded from reviewing a conviction on this ground." Apt. Br. at 60. This is correct such as it is. *See United States v. Gaitan-Acevedo*, 148 F.3d 577, 586 (6th Cir. 1998). Recall also that this judgment was a deferred decision on the Rule 29 motion the defendants had made during trial, and the jury's decision is therefore of no concern or consequence. But again, this was merely one of several reasons for the court's finding that the prosecution had failed to prove a single conspiracy and, as the defense replies, these results (i.e., 52 acquittals out of 56 possibilities, with no convictions for any substantive act, any attempt at a substantive act, or any

"venture") at least suggest the overall weakness of the prosecution's case when considering prejudice.

Moreover, because our review here is de novo, *see Hughes*, 505 F.3d at 587, we need not nitpick the district court's findings or reasoning. Rather, we must consider the evidence produced at trial, viewing it in the light most favorable to the prosecution (i.e., the guilty verdicts), and determine whether the prosecution proved a single conspiracy as alleged in the indictment or whether, instead, its proof was a material and prejudicial variance from the indictment, warranting acquittal. We conclude from our careful review of the trial transcript and record that, if the prosecution proved any sex trafficking at all (and we have serious doubts that it did), then at best it proved two separate, unrelated, and dissimilar sex-trafficking conspiracies, involving different defendants, albeit with the same alleged victim, namely Jane Doe 2.

The first of these two "conspiracies" occurred from November 2006 to May 2007, when several Somali boys in Minnesota (some, but not all, members of the Somali Outlaws gang) enticed Jane Doe 2 into having sex with them for their own enjoyment, and with others for a relatively small amount of cash. Jane Doe 2 testified that a Somali boy would call her, tell her they had a "mission" for her (i.e., prostitution), and take her to an apartment where she would have sex for money. This typically occurred on Fridays, about once per month. She testified that the typical rate for a "mission" was $50 to $60, and she would do several in an evening, though she would also often have sex without charge, with gang members or their friends.[4]

---

[4] To put this in perspective, again accepting Jane Doe 2's testimony as true, five to ten missions in a night, at $50 to $60 each, would be $250 to $600 for the conspirators. Jane Doe 2 named at least eight conspirators in this venture; three of whom were defendants here (including Fahra, but *not* Kayachith or Yusef), while three others were indicted and two others were not. Jane Doe 2 offered no insight as to how the conspirators split the money, but she explained that one or more would pick her up (either at her school or at home) and drive her the 35 minutes to Fahra's apartment, or longer if to another apartment, and that she would often spend the night or the weekend there. Presumably, someone would pay to feed her during this time. And, from her testimony, it appears that they frequently took her shopping. All this is to say that the evidence presented did not depict this as an especially profitable operation. In short, this looks less like an organized venture than a crime of opportunity, involving these criminally ambitious young men and this gullible (or, more likely, reckless or rebellious) young woman.

The second "conspiracy" was two years later, during a single long weekend in April 2009, when a few different boys in Minnesota enticed Jane Doe 2 into having sex with them for their own enjoyment, and with others to raise money for a trip to Nashville. Jane Doe 2 testified that several of these boys had sex with her on Friday, without charge, and then decided on Saturday to raise money by charging others for her sexual services. The similarities between this sex-trafficking venture and the previous one, described above, are that both sets of conspirators were mostly Somali boys and both charged about the same rate of $50 or $60 for her services. Almost two years of inactivity separate the two events and there was no evidence of an interrelationship among the participants in the two events. While most of these purported conspirators were members of the same Somali Outlaws gang, they were different boys from before. And the manner and means of the trafficking were different: rather than taking Jane Doe 2 to an apartment, they drove her around to alleys where she had sex in the car. Also, based on her testimony, the sole purpose of this venture was to raise money for the car trip to Nashville.

Finally, and perhaps most tellingly, to the extent that Jane Doe 5's testimony proved anything (and, again, we have serious doubts that it did), it proved that several Somalis attempted to or did prey upon her vulnerability: a Somali woman in Nashville preyed on her mental instability by secretly collecting money from the men who had sex with her; each of the three Omar brothers sought to prey upon her similarly; as did two different Somali men in Minnesota. She did not testify or even suggest that any of these people acted in concert (conspiracy) with each other or with the boys who were prostituting Jane Doe 2 in Minnesota. She did not describe any overlap of conspiracies, interrelationship of ventures, or identity of operations or plans.

Based on our careful review of the record, we find as the district court did, that the evidence produced at trial, even viewed in the light most favorable to the prosecution (and the guilty verdicts), proved only that different and unconnected groups acted with different females

20

at different times in different cities and states. The prosecution did not prove a single, unified conspiracy as it had charged in the indictment, but proved at best multiple separate conspiracies.

Moreover, we find that extensive evidence presented about these multiple conspiracies, and the large number of improperly joined co-defendants, likely misled the jury into assuming a union of criminal intent, an agreement to cooperate, and an increased degree of culpability, thereby causing significant prejudice to these defendants. *See Swafford*, 512 F.3d at 843. Consequently, the variance between the charges in the indictment and the evidence produced at trial is reversible error and the acquittals are warranted. *See Hughes*, 505 F.3d at 587.

**B.**

The district court granted Fahra's acquittal on the same basis as it had Kayachith's and Yusef's (i.e., the material variance between the single-conspiracy indictment and the multiple-conspiracy evidence at trial). But the jury had also convicted Fahra of aiding and abetting the *actual* sex trafficking of Jane Doe 2, and the court's basis for that acquittal was less clear. On appeal, the government argues that the material-variance finding does not support an acquittal for aiding and abetting of actual sex trafficking, because that is not a conspiracy charge.

The government cites two out-of-circuit cases in which an acquittal on the conspiracy charge did not require acquittal on the substantive count: *United States v. Jackson*, 696 F.2d 578, 588 (8th Cir. 1982) (stating that "in some cases where a prejudicial variance necessitates reversal of a defendant's conspiracy conviction, the evidence of the defendant's guilt on the substantive charges may be so strong that the substantive convictions must be affirmed"), and *United States v. Variano*, 550 F.2d 1330, 1330 (2d Cir. 1976) (holding that "dismissal of the conspiracy count . . . had no collateral estoppel effect whatsoever on the remaining substantive count of the indictment"). The defense responds that neither of these cases *prohibits* the district court from acquitting on a substantive charge because the prosecution failed to prove the alleged conspiracy,

but instead hold only that the district court is *not required* to dismiss the substantive count under such circumstances. We agree with this reading of these (non-controlling) cases.

The defense cites *Barnard v. United States*, 342 F.2d 309, 313 (9th Cir. 1965), in which the Ninth Circuit reversed the conviction of a single defendant on a substantive charge because the prosecution had used "its theory that there was one over-all conspiracy" in an effort to involve that defendant, indeed "all of the defendants," in the substantive charge, to the prejudice of that defendant. The defense argues that the same happened here: the prosecution's attempt to involve all 30 defendants in the sex trafficking conspiracy charges allowed the introduction of substantial evidence unrelated to Fahra, such as all the evidence about the Rochester trip, the Nashville weekend and trip, and all of the Jane Doe 5 interactions. Because this severely prejudiced Fahra, who was only ever implicated in the events or "conspiracy" at his apartment from November 2006 to May 2007, the defense argues, the prosecution's failed attempt at proving one massive conspiracy undermines Fahra's conviction on the substantive charge.

The defense also argues that the absence of an overriding conspiracy affects venue, in that venue must be appropriate for each of the individual conspiracies. Since the conspiracy involving Fahra occurred entirely in Minnesota, and it is undisputed that Fahra was not involved in any of the events in Nashville, the finding of multiple different conspiracies makes Tennessee an improper venue for Fahra's prosecution, and reversal of his conviction is therefore warranted. *See United States v. Williams*, 274 F.3d 1079, 1083 (6th Cir. 2001) (reversing a conviction due to improper venue); *see also United States v. Crozier*, 259 F.3d 503, 519 (6th Cir. 2001) ("Venue is proper in the state or district where the offense was committed."); U.S. Const. art. III, § 2, cl. 3 ("Trial shall be held in the State where the said Crimes shall have been committed."); Fed. R. Crim. P. 18 ("[T]he prosecution shall be had in a district in which the offense was committed.").

We agree with both of Fahra's arguments and conclude that, one way or the other, this acquittal was appropriate.  The government has not persuaded us otherwise.

## V.  Conclusion

For the foregoing reasons, we AFFIRM the judgments of acquittal.

**HELENE N. WHITE, Circuit Judge, joined by SEAN F. COX, District Judge, concurring.**

I agree that the government's proof at trial varied materially and prejudicially from the indictment because the government presented proof of multiple separate conspiracies rather than a single overarching conspiracy, which likely substantially influenced the outcome of the trial. Thus, the district court did not err in granting the motions for acquittal on the conspiracy count. As to Fahra's conviction of aiding and abetting sex trafficking, the government concedes that if there was no single overarching conspiracy, venue was improper as to Fahra, who had no connection to the Nashville trip, and his acquittal on Count 12 should also be affirmed. Accordingly, I agree that the judgments of acquittal should be affirmed.[1]

---

[1] The government does not argue that a new trial, rather than acquittal, was the appropriate remedy.