LILLEHAUG, Justice.
Derrick Zechariah Smith was convicted of aiding and abetting first-degree murder and sentenced to life in prison with the possibility of release. On direct appeal, Smith, through counsel, raises four issues. First, he argues that his conviction was based on accomplice testimony that was insufficiently corroborated in violation of Minn. Stat. § 634.04 (2018). Second, he argues that the district court abused its discretion when it admitted evidence of three other-crimes incidents. Third, he argues that the court abused its discretion when it twice denied his motion for a *262 continuance to review newly produced evidence. Fourth, he argues that the court abused its discretion by sustaining the State's relevance objection to a question during the cross examination of a police investigator. Additionally, Smith raises several pro se claims. We affirm the judgment of conviction.
FACTS
Richard Ambers was shot and killed in Minneapolis while sitting in his car in the early morning hours of October 29, 2016. A person delivering newspapers noticed a slumped body inside a car that was parked on the 4800 block of Bryant Avenue North and called 911 at 4:43 a.m. While he spoke to the 911 operator, the delivery person saw two people approach the car and reach inside it. When police arrived, they discovered Ambers had been shot twice at close range. No bullet casings or other physical evidence were found at the scene.
The evening before he was murdered, Ambers had attended a Halloween party with his wife, K.A. After the party, Ambers drove K.A. home, arriving around 2:00 a.m. When Ambers failed to follow her into the house, K.A. called his cell phone. Ambers told her he was going to a relative's house and that he would return shortly. According to K.A., Ambers sold marijuana; he kept the drugs in a glass jar and carried hundreds of dollars with him. No glass jar of marijuana or large amounts of money were located in the car after the murder.
Because of the lack of physical evidence and absence of witnesses at the crime scene, police investigators began to reconstruct Ambers' movements from the 2:00 a.m. call with his wife until the 911 call at 4:43 a.m. Using Ambers' phone records, police contacted R.D., who said that he and Ambers had met at a Super America (SA) gas station in Brooklyn Center. Surveillance video from the SA shows Ambers meeting with R.D. around 3:15 a.m.
Thereafter, the video shows Ambers talking with appellant Derrick Smith. Smith had arrived at the SA with Tyrel Patterson, Brandy Jaques, and Ayan Wahab. The video then shows Ambers leaving with Wahab in his car.
As part of a plea agreement, Wahab provided police with details of what took place between the time they left the gas station and the murder of Ambers. Wahab was working as a prostitute; Smith was her pimp, and both Patterson and Jaques were her drivers. After the group met Ambers at the SA, they realized that he had drugs and cash and decided to rob him. The initial plan was that Ambers and Wahab would go to a hotel and then the others would carry out the robbery.
Ambers and Wahab, however, did not go to a hotel. Instead, Ambers drove to the home of a close friend, J.H., who came outside and spoke with Ambers. While waiting, Wahab observed drugs in a glass jar located in the car's center console, but she did not see any cash. J.H. testified that Wahab seemed agitated, kept checking her phone, and did not want to be there. Wahab testified that she was anxious because she believed that Smith, Patterson, and Jaques had failed to follow her and Ambers.
Around 4:15 a.m., Ambers and Wahab left J.H.'s house. Ambers drove Wahab to Jaques' house-located on the 4800 block of Bryant Avenue North-where Wahab was then living. Wahab went inside the house, where Smith and Jaques were waiting. Wahab testified that Smith was angry with her for returning without any drugs or money. Smith then attempted to call Ambers from Wahab's phone. At the same time, Jaques noticed that Ambers was still *263 in his car in front of the house, and Smith told Wahab to go back outside.
Wahab got back in the car with Ambers. A portion of their conversation was inadvertently recorded in the form of a voicemail to R.D. from Ambers' phone. Ambers and Wahab can be heard talking, followed by a dinging sound of the car door opening. The voicemail ends there. Wahab testified that Patterson appeared, opened the passenger door of Ambers' car, and pulled her out. As Wahab walked back to Jaques' house, she heard three gunshots. She did not look back and went into the house. Based on the timing of the recording of the voicemail and the 911 call, the shooting apparently took place between 4:39 and 4:43 a.m.
Shortly after the shooting, Patterson and Wahab left in Patterson's van. Smith called Wahab, and Wahab handed her phone to Patterson, who was driving. Wahab heard Smith ask if Patterson "took care of that," and heard Patterson reply, "yes." While crossing a bridge over the Mississippi River, Patterson handed Wahab something wrapped in a towel and told her to throw it in the river. She did so. Based on the weight and shape of the object, Wahab believed it to be a gun.
The next day, Wahab overheard Smith and Jaques talking while they thought she was asleep. Smith said that Wahab knew too much and that they should kill her. Wahab jumped out of a window, leaving all her possessions behind, and ran away.
As police continued their investigation, cell phone records led them to Wahab. She turned herself in voluntarily, and, after initially not accurately identifying Ambers, told officers what had happened. Wahab's statements to police were substantially the same as her trial testimony.
Cell phone records confirmed the calls described by Wahab: one between Smith's phone and Ambers' phone at the SA, and one between Wahab's phone-with Smith dialing, according to Wahab-and Ambers' phone just before the murder. Cell-site location information (CSLI) for both Smith's and Wahab's phones was obtained by the police. CSLI showed Wahab's phone traveling from the SA, to the area around J.H.'s home, to the area around Jaques' home, to the bridge where Wahab says she threw away the object in the towel. CSLI also showed Smith's phone in the area of the 4800 block of Bryant Avenue North at the time of the murder.
On December 29, 2016, Smith was charged by complaint with aiding and abetting second-degree murder. In April 2017, a grand jury indicted him on one count of first-degree felony murder and one count of second-degree murder.
During discovery, Smith's attorneys became aware of police reports that referenced phone calls made between December 5, 2016 and January 23, 2017, by Smith, Patterson, and Jaques, from the Scott County jail, where they were being held in connection with another murder. Counsel requested the calls on June 29, 2017. Prosecutors from the Hennepin County Attorney's Office did not produce recordings of the calls until sometime in mid-December 2017; counsel for Smith first learned the calls were available on December 27, 2017. The approximately 75 hours of recordings included calls both within and outside the period requested.
Smith's trial was scheduled to begin on January 2, 2018. That day, Smith moved for a continuance to review the jail-call recordings. The district court denied the motion. After the jury was selected and seated, Smith renewed his continuance motion, which was again denied. The jury found Smith guilty of aiding and abetting first- and second-degree murder. The district convicted him of the first-degree *264 charge, and sentenced him to life in prison with the possibility of release.
This appeal followed.
ANALYSIS
I.
We must first determine whether the testimony of Wahab, one of Smith's accomplices, was sufficiently corroborated. "Under Minnesota law, a criminal conviction cannot be based on the uncorroborated testimony of an accomplice." State v. Clark , 755 N.W.2d 241, 251 (Minn. 2008) ; see Minn. Stat. § 634.04 (2018) ("A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."). Whether an accomplice's testimony has been sufficiently corroborated is a question of fact for the jury. Clark , 755 N.W.2d at 251. Therefore, district courts "have a duty to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice." State v. Strommen , 648 N.W.2d 681, 689 (Minn. 2002).
We "have long held that evidence is sufficient to corroborate an accomplice's testimony 'when it is weighty enough to restore confidence in the truth of the accomplice's testimony.' " Clark , 755 N.W.2d at 253 (quoting State v. Sorg , 275 Minn. 1, 144 N.W.2d 783, 786 (1966) ). To be sufficient, such corroborating evidence need not "establish a prima facie case of the defendant's guilt," but it must " 'in some substantial degree tend[ ] to affirm the truth of [the accomplice's] testimony and ... point to the guilt of the defendant.' " Id. at 253-54 (quoting State v. Rasmussen , 241 Minn. 310, 63 N.W.2d 1, 3 (1954) ).
Among the facts that may be used to corroborate accomplice testimony are "participation in the preparation for the criminal act; opportunity and motive; proximity of the defendant to the place where the crime was committed under unusual circumstances; [and] association with persons involved in the crime in such a way as to suggest joint participation ...." Sorg , 144 N.W.2d at 786. We "review the evidence just as we would on a sufficiency challenge-in the light most favorable to the prosecution, and with all conflicts in the evidence resolved in favor of the verdict." State v. Nelson , 632 N.W.2d 193, 202 (Minn. 2001).
Smith argues that his conviction must be overturned because the corroborative evidence offered by the state in support of Wahab's testimony was "simply insufficient," and that, "[a]side from Wahab's testimony, there was little connecting Smith" to the murder of Ambers. We are not persuaded.
First, there is evidence that corroborates Wahab's testimony regarding the plan for the original robbery, and Smith's participation in developing that plan. Wahab testified that, after she initially ignored Ambers at the gas station, Smith talked with Ambers-including getting his contact information-and then proposed to Patterson, Jaques, and Wahab that they should rob Ambers. The SA surveillance video shows Smith talking to Ambers, while Ambers is in his car, and Smith is holding his phone. Phone records show a call between Ambers' phone and Smith's phone at this same time. CSLI shows the calls were made from the area around the gas station.
Wahab testified that she was used as bait to take Ambers to a place where *265 Smith and the others could rob him. The SA surveillance video shows Wahab leaving Patterson's van after Smith returns from talking with Ambers; she then talks with Ambers through the window of his car, gets inside, and leaves with Ambers. CSLI shows both Ambers' and Wahab's phones moving from the gas station along the route to J.H.'s home.
Wahab testified that she became nervous when it appeared that Smith, Patterson, and Jaques had failed to follow her and Ambers, as had been planned. J.H. testified that Wahab "seemed very agitated, like she didn't want to be where she was" and that Wahab "kept checking her phone."
Wahab testified that after leaving J.H.'s home, she and Ambers went to Jaques' home on the 4800 block of Bryant Avenue North. CSLI shows both Ambers' and Wahab's phones moving from the area near J.H. toward the area near Jaques' home. Wahab testified that after she went into Jaques' home, Smith used her phone to call Ambers. Phone records show two calls, at 4:34 a.m. and 4:36 a.m., from Wahab's phone to Ambers' phone. Wahab testified that, after going inside Jaques' house, she returned to Ambers' car at Smith's urging. The voicemail inadvertently left on R.D.'s phone by Ambers supports this testimony. CSLI also shows Smith's phone was in the area near Jaques' home at the time of the murder. In sum, Wahab's testimony about the robbery plan and Smith's participation is corroborated by evidence pointing to guilt.
Furthermore, Spreigl evidence corroborates Wahab's testimony. She testified that Smith had several guns, including a revolver. A victim of a shooting that took place only several hours before-and very near the scene of-the Ambers murder testified that Smith shot him using a chrome revolver. Because revolvers do not eject shell casings, that evidence may explain both the presence of a gun and the lack of casings at the Ambers murder scene.
Wahab also testified that Smith, Patterson, and Jaques planned and executed another robbery-turned-murder as a group, with Smith taking a lead role, only one month after Ambers was killed. Jonte Robinson, who participated in the Scott County robbery-turned-murder, described the roles of Smith, Patterson, and Jaques in planning and executing the robbery. Robinson also testified that, just before breaking into the home, Smith told Patterson "don't do what [Patterson] did last time." This was a significant admission by Smith.
The corroborating evidence introduced at trial came from many of the sources described in Sorg : "participation in the preparation for the criminal act" through the video and phone records at the gas station; "proximity of the defendant to the place where the crime was committed under unusual circumstances" through the CSLI of Smith's phone; and "association with persons involved in the crime in such a way as to suggest joint participation" through both the surveillance evidence from the SA and the Spreigl evidence from Robinson. 144 N.W.2d at 786.
Smith argues that there was no evidence placing Smith in proximity to Ambers' murder. But the CSLI evidence placed Smith's phone in the area of the murder scene at the time of the murder. Neither Minn. Stat. § 634.04, nor our accomplice-testimony jurisprudence, requires that the State offer physical evidence to meet its corroboration burden. Instead, the question is whether there is sufficient corroborative evidence "to restore confidence in the truth of the accomplice's testimony." Clark , 755 N.W.2d at 253 (citation omitted) (internal quotation marks omitted). Viewing "the evidence as a whole ,"
id="p266" href="#p266" data-label="266" data-citation-index="1" class="page-label">*266id. at 255, and in the light most favorable to the prosecution, as we must, Wahab's testimony was sufficiently corroborated to support Smith's conviction.[1]
II.
Next, we must decide whether the district court erred when it admitted evidence of three other-crimes incidents over the objections of the defense.
Generally, other-crimes evidence is not admissible to demonstrate that the defendant (a) has a propensity to commit crimes and (b) acted in accord with that propensity. See, e.g. , Minn. R. Evid. 404(b) ; State v. Ness , 707 N.W.2d 676, 685 (Minn. 2006). Such evidence, called Spreigl evidence after our decision in State v. Spreigl , 272 Minn. 488, 139 N.W.2d 167 (1965), "may be admitted only for limited, specific purposes," including "showing motive, intent, knowledge, identity, absence of mistake or accident, or a common scheme or plan." Ness , 707 N.W.2d at 685.
Even if offered for one of these purposes, Spreigl evidence will not be admitted "if its probative value is substantially outweighed by its tendency to unfairly prejudice the factfinder." Id. We review admission of Spreigl evidence for an abuse of discretion. Id. The defendant bears the burden of showing both error and resulting prejudice. Id.
A.
The jury heard evidence of three other-crimes incidents involving Smith: (1) a shooting committed on October 28, 2016, just hours before Ambers' killing in the early morning of October 29; (2) a robbery-murder committed on November 23, 2016; and (3) a shoot-out with police that immediately followed the November 23 robbery-murder.
The first Spreigl incident was based on testimony from D.Y., a friend and romantic partner of Jaques. Around 11:30 p.m., just hours before Ambers was killed, D.Y. left work and went to Jaques' home. When D.Y. arrived, Jaques came out of her house and D.Y. noticed that she was behaving oddly-he described her as being "jittery" and "shaky." As D.Y. tried to calm Jaques down, she continued to repeat that she had to get what D.Y. described as "a big bag of white substance" to someone called Solid.[2] At this point, a man started quickly walking towards D.Y. and Jaques. He began to shout at D.Y., asking "who the f* *k are you?" and then shot at D.Y. five times: twice at point-blank range, and three more times as D.Y. ran away. D.Y. was shot in the leg and hand. D.Y. identified Smith as the man who shot him and described the weapon as a chrome revolver.
The second Spreigl incident is based on testimony from Jonte Robinson, a childhood friend of Patterson. On November 23, 2016, Robinson and Patterson met up with Smith and Jaques. After gambling at a *267 casino, the group drove to a place nearby. Smith and Jaques then plotted a robbery. Smith took a bag from the trunk and handed out masks, shoes, gloves, zip ties, and a gun. The four then broke into a house and took the people inside as hostages. Before entering the house, Robinson heard Smith say to Patterson "don't do what [you] did last time." Eventually, Patterson shot one of the hostages in the knee. Another hostage then ran out of the house, and the robbers told Robinson to chase her. After leaving the house, however, Robinson ran in the opposite direction of the fleeing hostage. He flagged down a snowplow and asked the driver to call 911. The man shot by Patterson died.
The third Spreigl incident was based on testimony from Brandon Carlston, a police officer with the Eden Prairie Police Department. After the snowplow driver called 911, Smith, Patterson, and Jaques fled the scene. Carlston intercepted their car, which spun off the road. Smith, Patterson, and Jaques all got out and ran-Smith in one direction and the other two in the other. Carlston chased after Smith while other officers chased Patterson and Jaques. As Smith reached a nearby strip-mall parking lot, Carlston noticed Smith had a gun. When Carlston ordered Smith to drop his gun, Smith shot at Carlston. Carlston returned fire and hit Smith. Smith had two handguns in his possession.
B.
The district court ruled that the three Spreigl incidents could be admitted to prove (1) the relationship between Smith, Patterson, and Jaques-that this was a robbery crew rather than just a group of associates-and Smith's leadership role in the crew; (2) the ability of Smith, Patterson, and Jaques to access guns; and (3) a common scheme or plan that Smith, Patterson, and Jaques carried out.
Five conditions must be satisfied for Spreigl evidence to be admitted: (1) prosecutors must give notice they intend to use evidence of other bad acts; (2) those bad acts must be proved by clear-and-convincing evidence; (3) prosecutors must say what the evidence will be used to prove; (4) the evidence must be relevant and material to the case; and (5) prosecutors must show that the probative value of the evidence is not outweighed by its potential for prejudice. Ness , 707 N.W.2d at 686. Smith argues that the Spreigl evidence in this case fails on the fourth condition, relevance.
After careful consideration, we conclude that all three Spreigl incidents were relevant to the prosecution's case. The shooting of D.Y. took place just hours before Ambers' murder, in the same vicinity, and using a weapon consistent with the prosecution's theory that Ambers was killed with a revolver. Although not clearly a robbery, the incident is sufficiently close in time to lessen the necessity of showing a similar modus operandi. See, e.g. , State v. Clark , 738 N.W.2d 316, 346 (Minn. 2007) ("Generally, as the time span increases between the past misconduct and the crime charged, the similarity between the acts in terms of modus operandi must likewise increase in order for the past misconduct to be relevant." (emphasis added)); State v. Frisinger , 484 N.W.2d 27, 31 (Minn. 1992) ("[T]he preferred approach is for the trial court to focus on the closeness of the relationship between the other crimes and the charged crimes in terms of time, place and modus operandi.").
The second incident, the Scott County robbery-murder, was markedly similar to the murder of Ambers. The plan was to steal money and drugs, as was the case with Ambers. It involved the same key actors-Smith, Patterson, and Jaques-and the use of guns. It showed how the *268 group operated. It took place only three-and-a-half weeks after the murder of Ambers. The comment by Smith that Patterson should not do what he did last time was an additional link between the two crimes. See, e.g. , State v. Morgan , 310 Minn. 88, 246 N.W.2d 165, 167-68 (1976) (allowing admission of evidence that the defendant confessed to a murder during the course of a subsequent kidnapping), cert. denied , 430 U.S. 936, 97 S.Ct. 1564, 51 L.Ed.2d 782 (1977).
The third Spreigl incident, part of the res gestae of the second robbery-murder, also demonstrated the ongoing common scheme of criminal activity among Smith, Patterson, and Jaques. It also showed Smith's possession and use of handguns.
We next consider whether the Spreigl incidents were unduly prejudicial. Although we have some concerns about the third incident, we conclude that the district court did not abuse its discretion in admitting all three incidents. Further, the district court gave a proper limiting instruction before D.Y., Robinson, and Carlston testified, and gave it again at the end of the trial. See Clark , 738 N.W.2d at 347 (finding no prejudice, in part, because "the district court gave a cautionary jury instruction before the Spreigl evidence was admitted and before closing argument"). The State also told the jury in its closing that: "you can't convict [Smith] in this case because of what he did [in] those incidents, but you can use that information in understanding the role of the parties, understanding who's the boss, what's the modus operandi[.]"[3] Therefore, we decline to reverse the conviction on this ground.
III.
We turn next to the question of whether the district court erred when it denied Smith's two continuance motions. "The granting of a continuance is a matter within the discretion of the [district] court and its ruling will not be reversed absent a showing of clear abuse of discretion." Dunshee v. Douglas , 255 N.W.2d 42, 45 (Minn. 1977). We, therefore, must "determine whether the defendant was so prejudiced in preparing or presenting [a] defense as to materially affect the outcome of the trial." State v. Lloyd , 345 N.W.2d 240, 247 (Minn. 1984). Here, in the face of a likely discovery violation,[4] the district court twice denied a motion for a continuance so that the defense could listen to recordings of jail calls made by Smith, Patterson, and Jacques.
Assuming without deciding that the defense did not have sufficient time to review *269 the calls, Smith has failed to demonstrate that the denial materially affected the outcome of the trial. At the time of trial, both Patterson and Jaques had pending charges. Patterson pleaded guilty to first-degree murder on August 8, 2018. See Register of Actions , 27-CR-16-33298. Jaques had her murder charges dismissed on September 10, 2018. See Register of Actions , 27-CR-16-33308. Neither was called upon to testify in Smith's trial. Had they been called, they could have asserted their Fifth Amendment privilege against self-incrimination. See Johnson v. Fabian , 735 N.W.2d 295, 310 (Minn. 2007) (holding that a defendant can claim the privilege against self-incrimination until conviction, and as long as a direct appeal of that conviction is pending or the time for direct appeal of that conviction has not expired). The jail calls, as the district court noted, would likely have been inadmissible hearsay.
Additionally, the State argues persuasively that Smith has failed to provide any additional evidence of prejudice. Assuming that the jail calls included some relevant and admissible evidence, and that a continuance would have allowed Smith to find and use it, Smith's counsel have had ample time to listen to the calls in the year since his conviction. Yet nothing in the record or in Smith's brief suggests that such evidence has been discovered. The only apparent item of interest discussed in Smith's brief was a call from Jaques that served as the basis for Smith's renewed motion on January 8, 2018-more than a year ago. Because Smith has not carried his burden to demonstrate prejudice, we cannot say the district court abused its discretion by denying Smith's motion for a continuance.
IV.
The final issue raised by Smith through counsel is whether the district court abused its discretion when it sustained the prosecution's relevance objection during cross-examination of a police investigator regarding her investigation into Wahab's statements to police.
The question arises because Wahab testified in an unrelated criminal proceeding in another state. See United States v. Fahra , 643 F. App'x 480 (6th Cir. 2016). In its decision in this unrelated matter, the Sixth Circuit speculated about the truthfulness of the testimony given by witnesses in a case in the United States District Court for the Middle District of Tennessee. Id. at 484 ("Before continuing, we acknowledge that we are proceeding, as we must, on the story the prosecution presented at trial, despite our acute concern, based on our painstaking review of the record, that this story of sex trafficking and prostitution may be fictitious and the prosecution's two primary witnesses [may be] ... unworthy of belief.").
During cross examination of Minneapolis Police Sergeant Twila Villella, who served as an investigator here, Smith's counsel asked, "And did you look at the case [Wahab] testified to in Tennessee?" The State objected on relevance grounds. Smith argues that, by sustaining the objection, the district court violated the Confrontation Clause. The State argues that the issue is whether Smith was impermissibly attempting to admit opinion evidence-that is, the opinion of witness truthfulness offered by the Sixth Circuit panel in Fahra . Both sides miss the mark. The question properly before us is whether the district court erred in sustaining a relevance objection. It did.
"Evidence is relevant and has probative value when it, in some degree, advances the inquiry." State v. Schulz , 691 N.W.2d 474, 478 (Minn. 2005). "A fact is relevant if, when taken alone or in connection of other facts, [it] warrants a jury in *270 drawing a logical inference assisting, even though remotely, the determination of the issue in question." Id. ; see also State v. Lee , 282 N.W.2d 896, 901 (Minn. 1979) ("Any evidence that logically tends to prove or disprove a material fact in issue is relevant."). Whether Villella had reviewed a federal appellate court's decision that called into question the truthfulness of a witness who testified against Smith could reasonably "warrant[ ] a jury in drawing a logical inference" when determining the credibility of the investigator and the thoroughness of her investigation. Although there are other grounds on which an objection to the question could have been sustained, the question of relevance is the only one before us. Whether Villella looked into the Tennessee case is relevant to the thoroughness of Villella's investigation; thus, it was error to sustain the objection.
To prevail, however, Smith must also show prejudice, which he has not done. Although Smith's question might have elicited relevant evidence, the Sixth Circuit decision itself would have been inadmissible hearsay. Smith's goal was to admit the opinion or testimony about it as an out-of-court statement used to prove the truth of the matter asserted: that Wahab was untruthful. Because the opinion or testimony would have been inadmissible, there is no prejudice.
Smith's subsequent actions at trial further demonstrate the absence of prejudice. After the State's objection was sustained, the prosecutor made a motion to exclude any reference to the Sixth Circuit opinion when Wahab took the stand. The district court did not rule on that motion, but said to Smith, "you are certainly on notice as to where the [S]tate's coming from ... and I think at this point we'll have to wait and see if [Wahab]'s called as a witness ... and what the direct testimony is." The district court then added "before [Smith] ask[s] any questions that relates to this we're going to have to address the issue and have an understanding about whether you can ask the question ...." When Wahab testified, Smith did not attempt to raise the issue of the Sixth Circuit opinion. At no point during Wahab's testimony was the issue addressed or the Sixth Circuit opinion discussed-despite extensive cross-examination that called into question Wahab's credibility in several respects.
Although the district court erred by sustaining the relevance objection, the error was harmless.
V.
In addition to the claims brought by counsel, Smith raises several pro se claims: (1) that trial counsel was ineffective; (2) that the district court erred by sealing a portion of the trial record; (3) that the district court erred when it admitted "non-self-inculpatory statements" of Wahab, Patterson, Jaques, and Robinson; (4) that a jury instruction was erroneous; (5) that Minnesota's felony-murder statute, Minn. Stat. § 609.185(a)(3) (2018) unconstitutionally fails to require intent; and (6) that the district court erred when it admitted testimony from both Wahab and Robinson that they had pleaded guilty. We will address each claim in turn.
A.
To show ineffective assistance of counsel, Smith must show that: (1) trial counsel's performance fell below an objective standard of reasonableness, and (2) Smith was prejudiced by counsel's below-standard performance. State v. Lahue , 585 N.W.2d 785, 789 (Minn. 1998) (citing Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ). To show prejudice, a "defendant must show that counsel's errors 'actually' had an adverse effect in that but for the errors *271 the result of the proceeding probably would have been different." Gates v. State , 398 N.W.2d 558, 562 (Minn. 1987). If one prong is not met, we need not address the other. State v. Rhodes , 657 N.W.2d 823, 842 (Minn. 2003). We review ineffective-assistance claims de novo. Id.
Smith argues that his trial counsel was ineffective for failing to question Wahab about the Sixth Circuit opinion. As we have already discussed, there was very little that defense counsel could do with the opinion from another, unrelated case. In this respect, counsel was not ineffective.
B.
After discussion of the Sixth Circuit opinion, the State moved for the portion of the transcript dealing with that issue to be sealed. Smith did not object to the motion.
"When a defendant fails to object at trial, the forfeiture doctrine generally precludes appellate relief." State v. Lilienthal , 889 N.W.2d 780, 784 (Minn. 2017). "However, Minnesota Rule of Criminal Procedure 31.02 allows appellate courts to correct forfeited errors not timely raised in district court when there is a '[p]lain error affecting a substantial right.' " Id. at 785 (citation omitted). To show plain error, a defendant must show at least (1) error; (2) that was plain; and (3) that affected substantial rights. Id. If the defendant fails on any one of the prongs, we need not consider the others. Id.
Here, no error occurred. Smith's pro se brief provides no authority for the proposition that, in this case and for the reason stated, it was an error to seal a portion of a trial transcript.
C.
Smith argues that the district court erred by admitting "non-self-inculpatory statements" by Wahab, Patterson, Jaques, and Robinson. As the State notes, this claim is likely based on a misreading of Minn. R. Evid. 804(b)(3). Because the rule applies expressly only when "the declarant is unavailable as a witness," Minn. R. Evid. 804, this claim cannot apply to Robinson and Wahab, who both testified at trial. As for Patterson and Jaques, the defense never objected to hearsay evidence involving either of them-indeed, it is unclear to which statements Smith is referring. We see no error.
D.
Smith argues that the district court erred on both (1) the instruction given to the jury regarding direct and circumstantial evidence, and (2) the instruction regarding unanimous verdicts. Smith did not object at trial, and therefore must show plain error.
The direct-and-circumstantial-evidence instruction exactly tracked the model instruction. See 10 Minn. Dist. Judges Ass'n, Minnesota Practice-Jury Instruction Guides, Criminal , CRIMJIG 3.05 (6th ed. 2015). We have frequently upheld the use of that instruction, most recently in State v. Fox , 868 N.W.2d 206, 222 (Minn. 2015). There was no error.
The unanimous-verdict instruction differed slightly from the model instruction. These differences-the most substantial of which is the addition of the sentence "Do not let your stubbornness prevent you from listening fairly to the suggestions of your fellow jurors. None of us is so wise that we cannot learn from others"-cannot be read, however, as an impermissible attempt by the district court to coerce a jury into reaching a verdict. See State v. Jones , 556 N.W.2d 903, 912 (Minn. 1996) ("[I]t is *272 reversible error in Minnesota to coerce a jury towards a unanimous verdict.... A court, therefore, can neither inform a jury that a case must be decided, ... nor allow the jury to believe that a 'deadlock' is not an available option." (internal citations omitted)). There was no error.
E.
Smith argues that the felony-murder statute, Minn. Stat. § 609.185(a)(3) is unconstitutional because it does not have an intent requirement. But it does. Section 609.185(a)(3) requires "intent to effect the death of the person or another." The jury instruction given at trial also included intent as an element. By finding Smith guilty, the jury determined that the required element-the "intent to effect the death" of Ambers-had been proven beyond a reasonable doubt. The statute suffers from no constitutional deficiency related to intent.
F.
Smith argues that the district court erred by admitting testimony from Wahab and Robinson stating that they had each pleaded guilty. Smith did not object, so he must show plain error. Smith offers no Minnesota authority to support his argument. Instead, he relies on United States v. Austin , 786 F.2d 986 (10th Cir. 1986), in which the government's "birds-of-a-feather" argument to the jury that it intended to prove a relationship between "those ten men arrested and convicted in March" and "the four men on trial today," id. at 991, was determined to be reversible error. In this case, by contrast, the guilty pleas of his accomplices were not used by the prosecution, but were used by Smith himself , in an attempt to discredit Wahab and Robinson's testimony. There was no error.
CONCLUSION
For the foregoing reasons, we affirm the judgment of conviction.
Affirmed.

Smith also argues that the standard in this case should be heightened because "bargained-for accomplice testimony" such as Wahab's, "is even more unreliable." Smith cites the dissent in State v. Jackson , 746 N.W.2d 894, 901 (Minn. 2008) (Page, J., dissenting), to support this position, but has no other authority to suggest that a different standard applies when accomplice testimony is offered as part of a plea agreement. The district court instructed the jury on the law requiring corroboration of accomplice testimony, and the State noted the need for corroboration several times in its closing argument. Nothing suggests that the jury failed to heed that instruction or ignored Wahab's plea deal when assessing her credibility. Indeed, Wahab was thoroughly cross-examined on her plea agreement.

Minneapolis Police later identified Solid as the alias of Smith.

In Clark , we also determined there was no prejudice because the Spreigl evidence was admitted via the reading of a transcript, rather than "through compelling live testimony from past victims" and because "the state did not refer to the Spreigl evidence in its closing argument." 738 N.W.2d at 347-48. In State v. Harris , we did not find prejudice even with live testimony, because there was not "an overemphasis on the graphic detail." 560 N.W.2d 672, 678 (Minn. 1997). We reached this conclusion even though the testimony included "photographs and medical records." Id. The relatively brief testimony of two victims and one accomplice here do not rise to the level of prejudice that outweighs probative value. As for the reference to the Spreigl evidence in the State's closing, it included a reminder of the cautionary instruction and was brief.

Smith argues that the analysis should be one of a discovery violation. The State, however, correctly notes that the district court never decided whether turning over the recordings of the jail calls sometime in December was, in fact, a discovery violation. Although the State conceded at oral argument that turning over the recordings in December, even if due to delay on the part of Scott County law enforcement, was a discovery violation, the posture of this claim on appeal remains a question of denial of a continuance.