STATE OF MINNESOTA

IN SUPREME COURT

A22-1277

Carlton County                                                                                                    Chutich, J.

State of Minnesota,

          Respondent,

vs.                                                                                                    Filed:  February 28, 2024
                                                                                                    Office of Appellate Courts

Sheldon James Thompson,

          Appellant.

_____

Keith Ellison, Attorney General, Peter Magnuson, Assistant Attorney General, Saint Paul, Minnesota, and

Lauri A. Ketola, Carlton County Attorney, Carlton, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godes, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      Because the State has met its burden to show that appellant's substantial rights were not affected by any plain error alleged to have occurred in the prosecutor's closing argument, the defendant is not entitled to a new trial.

1

2.     Appellant has not shown that speculative statements are a rampant form of prosecutorial misconduct and therefore a prophylactic reversal under our supervisory power is not warranted.

Affirmed.

O P I N I O N

CHUTICH, Justice.

Following the brutal murders of 27-year-old Jackie Defoe, her 20-month-old son, Kevin Lee Shabaiash, Jr., and her unborn child, a grand jury indicted appellant Sheldon James Thompson for eight offenses, including first-degree premediated murder for each victim.   During closing arguments in the ensuing jury trial, the prosecutor made statements—without objection—concerning Thompson's motive for the murders and his activities before, during, and after the murders.   The jury found Thompson guilty as charged, and the district court imposed three consecutive sentences of life without the possibility of release.

On appeal, Thompson claims that he is entitled to a new trial, asserting that during closing argument, the prosecutor committed unobjected-to misconduct that was plain and affected his substantial rights.   Alternatively, he contends that we should use our supervisory powers to order a new trial because prosecutors continue to disregard the prohibition against making speculative statements in closing arguments.   Because respondent State of Minnesota has shown that there is no reasonable likelihood that the absence of the alleged misconduct would have had a significant effect on the jury's verdict,

2

and because Thompson has not shown that there is a widespread pattern of prosecutors engaging in improper speculation during closing argument, we affirm.

### FACTS

A Carlton County grand jury indicted Thompson for eight offenses, including three counts of first-degree premeditated murder for the killing of his girlfriend, 27-year-old Jackie Defoe, her 20-month-old son, Kevin Lee Shabaiash, Jr., and her unborn child. Thompson pleaded not guilty and demanded a jury trial.

At trial, the State presented the following evidence. On March 6, 2020, while giving his cousin a ride, Thompson told her that "he killed [Defoe] and her son." When his cousin asked what happened, Thompson repeated that he had killed Defoe and Kevin and that he needed his cousin to "drive him out of Minnesota." He told her "something about [Defoe] stabbing him" and that he took the knife from Defoe and stabbed her. Thompson also made a choking gesture but did not specifically say how he killed Defoe and Kevin.

The next day, police searched Defoe's Locke Lane home in Cloquet. Officers discovered the dead body of Defoe in her bedroom closet under a pile of clothes. She had a "very large slash mark on her throat," and it was later determined that she had been stabbed over 30 times. Police discovered Kevin's body under blankets on his bed in his bedroom. His skull had been fractured, as well as two bones in his right leg.

Police suspected that Thompson was responsible for the murders. Thompson and Defoe began dating in the fall of 2019, and he sometimes lived in her home on Locke Lane. Thompson is not Kevin's father and, according to Defoe's mother, he was "kind of cold"

toward the child. Defoe was 18–20 weeks pregnant with Thompson's child, and Defoe's mother testified that she heard him say that "he wanted to get rid of the baby."

During the investigation of the murders, police found physical evidence that corroborated Thompson's confession,[1] including a partial bloody palm print in Defoe's bedroom that was made with Defoe's blood and matched Thompson's palm print. DNA testing revealed that Thompson could not be excluded as the source of DNA found under the fingernails of Defoe's right hand. In addition, Thompson's blood was found on the wall above Kevin's body and on the bathroom faucet.[2]

Eyewitness testimony placed Thompson at Defoe's home at various times between March 3 and March 6, in three different vehicles. A surveillance camera from a nearby clinic captured the traffic entering and leaving Locke Lane, a dead-end street with only five homes on it. The images captured on the surveillance footage corroborated witness testimony describing Thompson's activities before and after the murders. The footage showed that on March 5, the day before Thompson made his confession to his cousin, his Buick drove onto Locke Lane for 1 minute in the early morning from 4:45 a.m. until 4:46 a.m. The Buick then returned and remained at Defoe's home for almost 2 hours

---

[1]    The term "confession" encompasses statements made to friends and acquaintances after the commission of the charged offense in which the defendant acknowledges guilt of the crime. *State v. Heiges*, 806 N.W.2d 1, 12 (Minn. 2011), *abrogated on other grounds*, *State v. Holl*, 966 N.W.2d 803, 813–14 (Minn. 2021) (clarifying that Minn. Stat. § 634.03 (2020) does not include a trustworthiness standard). Thompson made other incriminating statements at the time of his arrest and during recorded jail calls. For example, at the time of his arrest, Thompson said that "he had messed up and he was going to go away for a long time."

[2]    When the police arrested Thompson, they observed a cut on his right pinky finger.

4

beginning at 8:17 a.m. and ending at 9:58 a.m., before returning for about another hour, 4 minutes later.

The State presented medical testimony about the brutal nature of the murders. Dr. Quinn Strobl, the chief medical examiner at the Midwest Medical Examiner's Office, testified that Defoe's neck wound was fatal. The doctor described numerous other injuries, including bruising on the left side of her face and neck; blunt and sharp-force injuries to her left upper arm and shoulder; and more than 30 stab wounds in her neck and back which caused internal injuries: both lungs were punctured, and her diaphragm and one of her ribs was cut. Dr. Strobl explained that it takes "significant force" to penetrate a person's skin and then cut a bone. One wound had markings around the stab wound consistent with a "hilt mark," showing "that the knife went all the way in and impacted the skin on that guard." Dr. Strobl also identified "defensive-type wounds" on Defoe's hands and fingers. The doctor concluded that Defoe's death was the result of a homicide, and the cause was "[m]ultiple sharp and blunt-force injuries."

Dr. Strobl also described the injuries inflicted on Kevin. These included many blunt-force wounds on the right side of his head, neck, and shoulder; a skull fracture; a jaw fracture; internal bleeding under the scalp and over the brain; and fractures in his right tibia and right femur, which caused displacement of these bones and additional internal bleeding. Kevin had a small, dotted pattern of "spray" around his mouth, consistent with blood from his mouth that was either coughed or breathed out. According to Dr. Strobl, blunt-force trauma wounds like these can be caused by car crashes, punches, and kicks.

The doctor concluded that Kevin's death was the result of a homicide, and the cause was "[m]ultiple blunt-force injuries."

Four witnesses testified to Thompson's pattern of domestic abuse, including in his relationship with Defoe. Thompson does not contest the validity of this testimony on appeal. First, Defoe's mother testified that Thompson was controlling—accusing Defoe of cheating on him, going through her cellphone, taking her debit card from her, transferring title to her Buick in his name, and preventing her from seeing her mother— and explained that Defoe seemed "[j]ust a little scared of him." She cited one instance in early January 2020, when Defoe drove to her mother's house, upset, and her mother accompanied her back to Locke Lane because Defoe "was scared to go home by herself."

Second, a domestic abuse advocate testified that in late January 2020, Defoe contacted her, and the locks of the Locke Lane home were changed for her safety. The advocate also provided Defoe a prepaid cellphone.

Third, on January 31, Defoe called a close friend sounding "stressed out really bad." She told her friend that she did not feel safe and did not want to be home alone. Defoe asked her friend to bring her a cellphone charger because Thompson had taken her chargers and her phone's SIM card, making her cellphone usable only on Wi-Fi. When her friend arrived at the home, she noticed a bruise on Defoe's cheek. Thompson arrived shortly after and pounded on the door. Defoe told her friend not to let him in because a DANCO[3] prohibited her from contacting him. Defoe told her friend that she had Thompson's "stuff

---

[3]      A DANCO refers to a Domestic Abuse No Contact Order issued by a court. *See* Minn. Stat. § 629.75 (2022).

packed up." When Defoe's friend opened the door and tried to "give him his stuff," Thompson pushed past her, into the house, telling Defoe, "F**k you, b*tch. I want my sh*t." He also pushed Kevin down saying, "get out of the way, little mother f**k*r."

Fourth, the jury heard testimony from Thompson's ex-wife that Thompson violently assaulted her three times between 2013 and 2017. She described a time when Thompson choked her until she lost consciousness. When she regained consciousness, Thompson punched her repeatedly and bit one of her arms as she tried to protect herself. In another assault, Thompson grabbed the steering wheel while she was driving and punched her in the face repeatedly until the car crashed. Before crashing, Thompson had threatened to take her to "Ditch Banks" where "no one would find [her]." She further testified about another time when Thompson tried to "stomp [her] head into the concrete floor in the garage," breaking her jaw. While he attacked her, Thompson told her, "You're done. This is what you wanted." The district court gave cautionary instructions before Thompson's ex-wife testified and again before jury deliberation to mitigate any prejudicial impact of her testimony.

The State presented additional evidence of Thompson's activities on March 5, 2020. Thompson's cousin saw personal items from Defoe's home, including a television, "a bunch of tools, a Michael Kors bag," and other items in Thompson's Buick. That afternoon, Thompson called H&R Block Emerald, which was significant because Defoe had received a tax refund of $5,067.05 on an Emerald card in late February. After the call, someone in a white stocking cap withdrew most of Defoe's remaining tax refund on her Emerald card. The withdrawal was captured on surveillance video. About 3½ hours after

7

the withdrawal, a "jittery" Thompson arrived at G.W.'s house wearing a white stocking cap. G.W. knew Thompson and ran a car business from his home. G.W.'s girlfriend testified that Thompson told her, "I got cash in my pocket. I need a car."

Thompson waived his right to testify, and the defense did not call any witnesses.[4] Before closing arguments began, the district court instructed the jury:

> Attorneys are officers of the court. It is their duty to make objections they think proper and to argue their client's cause. However, the arguments or other remarks of an attorney are not evidence.

> If the attorneys or I have made or should make any statement as to what the evidence is which differs from you[r] recollection of the evidence, you should disregard the statement and rely solely on your own memory. If an attorney's argument contains any statement of the law that differs from the law I give you, disregard the statement.[5]

The prosecutor's closing argument spanned 36 pages of the trial transcript, later followed by a 15-page rebuttal argument. The prosecutor summarized the evidence and the reasonable inferences that the jury could draw from that evidence as it pertained to the

---

[4] Although Thompson did not call witnesses or testify on his own behalf, on appeal he posited alternative inferences from the admitted evidence that contradicted the prosecutor's arguments. First, he challenged the State's theory that the murders were committed between 8:19 a.m. and 9:58 a.m. and that Thompson returned 4 minutes later to steal Defoe's valuables and screw the bedroom doors closed. Thompson offered an alternative inference that he had left the Locke Lane home at 9:58 a.m. to grocery shop, returned when he realized that he forgot his wallet, and then argued with Defoe who pulled a knife on him. In another instance, Thompson offered a second inference to contradict the State's theory that his blood was found above Kevin's bed because his pinky finger was bleeding when he killed the child. He noted that because there was no blood tracked on the carpet in Kevin's room, it is possible that he sustained the cut on his pinky any time during the 3 days between the murders and his arrest.

[5] Likewise, the prosecutor stated in rebuttal: "Now, ladies and gentlemen, you are entitled to rely on your common sense but also on your own recollection of the evidence, not on what I say or [the defense] says. What we say is not evidence."

State's theory of Thompson's motive for the murders, his premeditation and "planning activity," and his activities during and after the murders. Defense counsel did not object to the prosecutor's statements in the quotes that follow, including those statements that are italicized:

> The defendant *was sick and tired of Jackie Defoe. Sick of her needs, sick of her trying to keep tabs on him, sick of her keeping him tied down.* The relationship deteriorated quickly. He accused her of cheating, even though he was the only man in her life. *He wanted to be free from her.* She was pregnant with his child, but he said he wanted to get rid of the baby. He didn't want that baby, *he didn't want to be tied to Jackie forever. He wanted a way out for good.*
>
> . . .
>
> He toyed with her emotions, he put her down, made her feel less, *but even though he didn't want her anymore, he wasn't going to let anybody else have her.* He wanted to keep that control; control of her body, control of her 20 month-old son, control of the baby in her belly, and control of her money.
>
> He knew that Jackie Defoe had gotten her taxes back in late February of 2020, and that was a big, big payday; $5,000 in a tax refund. And he took what was hers as his own. *And once her tax refund came back, he had no more use for her or her toddler son for that matter. He saw them as his property like they were his play things to use or to discard as he saw fit. And he was done being tied down. He wanted them out of his life. He wanted them gone.*
>
> So, on March 5, 2020, what did he do? He murdered them both and his unborn baby *to be rid of them once and for all. . . .*
>
> . . .
>
> The duration of the attack is another thing to consider. The condition of the kitchen may signal that *there was some sort of a pursuit of some kind.* Drawers were open, fridge was turned sideways. But either way, with or without a pursuit, [Thompson] continued to stab [Defoe] when she no longer had a blood pressure.
>
> . . .

9

During this time period, the defendant is at the house for approximately one hour and 41 minutes. We don't have to prove to you the exact time he murdered [Defoe] and [Kevin] but I'd submit to you that *this is a window where there's plenty of time for him to kill them, clean up a bit, and hide the bodies in a closet where he stuffed [Defoe's] body, and under the blankets where he put [Kevin's] body.*

. . . he leaves at 9:58 and he comes back immediately four minutes later. He returns to Locke Lane, and this time he stays for about an hour and one minute. Again, we don't have to prove to you exactly what he was doing in each of these moments of time, but I'd submit that *this is when he goes back in and loads up the car with everything he can carry, anything of value he can grab, and then seals up the doors from the hallway side, takes a drill and screws those doors shut to the bedroom of [Defoe] and [Kevin], and covers his tracks so no one can open the doors to see what he's done.*

. . .

[On March 6] at 5:06 p.m., the Diamante is seen on surveillance coming down Locke Lane. Now, *the defendant drives that Mitsubishi into Locke Lane* and he's there for 16 minutes. Again, we don't have to prove exactly what happened in this time frame, but I submit that *the defendant, having screwed the door shut from the outside, tries to get into [Defoe's] bedroom window because he knows he can't get in through the hallway side.* And when he can't get in that way, he goes in the front door, which is unlocked, like [J.C.] told you. And then he kicks in or forces in the bedroom doors from the outside *to get in and grab any remaining items of value that he may have left behind.*

Defense counsel had an opportunity to rebut the italicized statements in the prosecutor's closing argument. He decided to argue that there were problems in the State's case, summarizing them as follows: "And that is unclear forensics, that there is mistaken timing, and there's actually a lack of motive, that there is no real confession, and that this is actually a bad investigation."

10

The State's rebuttal spanned another 15 pages of the trial transcript. The prosecutor discussed the forensic evidence and the timeline of events and reiterated the State's theory of Thompson's motive and the premeditation element.

The jury found Thompson guilty on all eight counts. The district court entered a judgment of convictions for three first-degree premeditated murder offenses and imposed three consecutive life sentences without the possibility of release. Thompson appealed.

**ANALYSIS**

On appeal, Thompson claims that he is entitled to a new trial, asserting that during closing argument, the prosecutor committed unobjected-to misconduct that was plain and affected his substantial rights. More specifically, he contends that the prosecutor's statements italicized in the quotes above are improper speculation. Alternatively, he asserts that we should use our supervisory powers to order a new trial because prosecutors continue to disregard the prohibition against making speculative statements in closing arguments. We consider Thompson's arguments in turn.

I.

Because Thompson did not object to the relevant parts of the prosecutor's closing argument at trial, he forfeited appellate relief based on this alleged misconduct. *See State v. Smith*, 932 N.W.2d 257, 271 (Minn. 2019). The forfeiture doctrine plays a vital role in the criminal justice system because it encourages defendants to object before the district court so that any "errors can be corrected before their full impact is realized." *State v. Beaulieu*, 859 N.W.2d 275, 278–79 (Minn. 2015) (citation omitted) (internal quotation marks omitted). The modified plain-error analysis announced in *State v. Ramey*,

11

721 N.W.2d 294, 299–300 (Minn. 2006), however, provides a limited exception to the harsh consequences of the common law forfeiture rule.

"Under [a modified plain error analysis], the defendant must establish the existence of an error that was plain, and then the burden shifts to the State to establish that the plain error *did not* affect the defendant's substantial rights." *State v. Epps*, 964 N.W.2d 419, 423 (Minn. 2021). To meet its burden, the State must show "that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Ramey*, 721 N.W.2d at 302 (citation omitted) (internal quotation marks omitted). To determine whether the State has satisfied its burden, we consider, among other things: "(1) the strength of the evidence against [the defendant]; (2) the pervasiveness of the erroneous conduct; and (3) whether [the defendant] had an opportunity to rebut any improper remarks."[6] *State v. Peltier*, 874 N.W.2d 792, 805–06 (Minn. 2016).

Here, our analysis begins and ends at the third *Ramey* prong. Even if we assume, without deciding, that Thompson established the existence of an error that was plain, we conclude that the State has satisfied its burden to show that there is no reasonable likelihood

---

[6]    Thompson's analysis of prejudice is unavailing because it does not follow the *Peltier* framework. Thompson argues that the State's imagined motive for the killings caused the jury to believe that Thompson was the killer. He argues that without this false motive, the jury would have "undoubtedly question[ed] why Thompson, who had only been dating Defoe for a matter of months, who had no history of physically assaulting Defoe, and who benefitted financially from living with Defoe, would kill her and, especially, her 20-month-old son." This argument fails to acknowledge that Thompson confessed to the murders and his confession was corroborated by independent evidence.

that the absence of the misconduct in question would have had a significant effect on the verdict of the jury.

First, the evidence of Thompson's guilt is very strong. Thompson confessed to his cousin that he killed Defoe and Kevin, and he made other incriminating statements when apprehended. Forensic evidence, including Thompson's partial palm print in Defoe's blood, his blood right above Kevin's bed and on the bathroom faucet, and DNA under the fingernails of Defoe's right hand corroborated his conviction. In addition, at least two people saw Thompson with Defoe's valuable belongings right before and just after the killings and he withdrew nearly all the remaining balance of Defoe's tax refund hours after the killings.

Second, although the challenged misconduct is not de minimis, it was limited to 20 statements scattered throughout 41 pages of trial transcript. Moreover, the statements allegedly misdescribed the evidence presented at trial, rather than the law, and the jury was repeatedly instructed to disregard counsel's statements if they differed from the juror's recollection of the evidence.

Third, Thompson had the opportunity to rebut these speculative statements because almost all were made before defense counsel's closing argument. Although three of the statements were repeated during the prosecutor's rebuttal, they reiterated earlier points made in the prosecutor's closing argument, so no new allegedly speculative arguments were made during rebuttal. During defense counsel's closing argument, he decided to argue that there were problems in the State's case, summarizing them as follows: "And

13

that is unclear forensics, that there is mistaken timing, and there's actually a lack of motive, that there is no real confession, and that this is actually a bad investigation."

Having considered the strength of the evidence, the pervasiveness of the alleged misconduct, and defense counsel's opportunity to rebut the allegedly speculative remarks, we conclude that the State has satisfied its burden to show that there is no reasonable likelihood that the absence of the allegedly speculative statements would have had a significant effect on the verdict of the jury. This is especially true because Thompson confessed to the murders, his confession was corroborated by independent evidence, the jury was repeatedly instructed that it should disregard the statements of counsel if the statements differed from the juror's recollection of the evidence,[7] and defense counsel had an opportunity to rebut the allegedly speculative statements during his closing argument.

Because the State satisfied its burden that there is no reasonable likelihood that the absence of the alleged misconduct in question would have had a significant effect on the verdict of the jury, Thompson is not entitled to any relief from the harsh consequences of the common law forfeiture rule, which precludes appellate relief for unobjected-to errors.

II.

In the alternative, Thompson argues that prosecutors have repeatedly disregarded the prohibition against speculative arguments and therefore this court should use its supervisory powers to reverse his convictions prophylactically and order a new trial.

---

[7]     We must assume that the jury follows the court's instructions. *State v. Ferguson*, 581 N.W.2d 824, 833 (Minn. 1998).

14

The State counters that most of the complained of arguments were not pure speculation and that this type of prosecutorial misconduct is not rampant.

We will exercise our supervisory powers to order a new trial only in "exceptional circumstances." *Anderson v. State*, 982 N.W.2d 448, 456 (Minn. 2022) (citation omitted) (internal quotation marks omitted). Even in cases in which misconduct was not clearly prejudicial to the defendant's substantial rights, we may exercise our supervisory powers to order a new trial prophylactically. *See State v. Salitros*, 499 N.W.2d 815, 820 (Minn. 1993) (ordering a new trial because prosecutors persisted in employing tactics condemned by this court); *State v. Kaiser*, 486 N.W.2d 384, 387 (Minn. 1992) (ordering a new trial to underscore the importance of compliance with discovery obligations); *State v. VanWagner*, 504 N.W.2d 746, 750 (Minn. 1993) (ordering a new trial to ensure prosecutors comply with evidentiary rules, even when the evidence of guilt was overwhelming).

Even assuming that the prosecutor here made improperly speculative statements, Thompson has failed to show that speculative statements are a repeated problem across cases. Nor has he shown that this case presents exceptional circumstances requiring this court to exercise its supervisory powers. At most, Thompson has shown that during that the last 25 years, speculative statements by a prosecutor have been alleged in five prior appellate cases. *State v. Thompson*, 578 N.W.2d 734, 742–43 (Minn. 1998); *State v. Bradford*, 618 N.W.2d 782, 798–800 (Minn. 2000); *State v. Leake*, 699 N.W.2d 312, 326–28 (Minn. 2005); *State v. Pearson*, 775 N.W.2d 155, 162–64 (Minn. 2009); *Peltier*, 874 N.W.2d at 803–05. This showing does not suggest rampant prosecutorial misconduct warranting a prophylactic reversal under our supervisory power.

15

**CONCLUSION**

For the foregoing reasons, we affirm the decision of the district court.

Affirmed.